Defendant GainJet, a foreign airline, helped orchestrate the abduction of a Texas resident from Texas and now claims it can't be sued in Texas. That's wrong and foreclosed by binding precedent. We're here on a motion to dismiss. GainJet is arguing its own version of the facts, but at this stage our facts control and we are entitled to every reasonable inference from those facts. And a reasonable inference is this, that GainJet authorized the false flight information before the bishop relayed it to Mr. Rusesabagina in Texas. That is, it was GainJet's lie sent into the forum. That is the forum contact. This inference flows directly from the facts, but I want to focus on two facts here. First, GainJet did, in fact, authorize the false flight information and we know this because they said it to him, to his face, themselves. And that same lie, the same exact lie, was relayed into Texas by the bishop. If we get to the conspiracy issue, what is your best argument, what is your best case that supports your argument of that conspiracy does help give jurisdiction? It would be Guidry versus U.S. tobacco. And in that case, the court notes that conspiracy has never been expressly adopted by this circuit, but it has certainly not been rejected, right? The court in Guidry left the door open for conspiracy and even left instructions for the district court if it wished to go down that route. So we're not claiming that there is a robust adoption of conspiracy jurisdiction in this circuit, but it's not true that it has been expressly foreclosed. And what's your best argument that we should adopt it if we end up in that arena? I'm not saying we will end up in that arena, but if we do. Well, Your Honor, obviously the jurisdictional analysis is a case-by-case basis, and this case presents facts that fit very well into the test that most circuits adopt on this issue. And that test is twofold. Did the conspiracy itself expressly target the forum? And were there overt acts in furtherance of the conspiracy in that forum? And that test is easily met here. Now, the conspiracy itself is to lure a man out of the protections of his home state. So it expressly targets Texas. And to the second element, were there overt acts committed in Texas as part of the conspiracy? That's also a matter of record. The bishop relayed the false flight information, the false itinerary, however you would like to phrase it, into the state via WhatsApp in the summer of 2020. So that element is met here. And this is the test adopted by the D.C. and Seventh Circuits. But in 887 of the record, we have a chart laying out the different positions. There are varying positions amongst the circuits, but this is, we posit, the most fair test and one that most adopt. So to return to the Calder analysis for a moment, we have those two facts on record. We have the fact that Gainjet is indeed complicit in this. They told the lie to Mr. Rusesabagina himself. And that same exact lie was relayed to Mr. Rusesabagina in the forum. And it's a lie about a Gainjet aircraft and a Gainjet flight path and a Gainjet passenger. So from these two facts on the record, it is a reasonable inference that we are entitled to at this stage that Gainjet authorized the relaying of that lie. Now, if there were, to frame this, to really hone in, because this really is the core of the matter here today, if there was a passenger ticket in this case, we would all agree there's a forum contact. For example, if Gainjet had issued a passenger ticket, sent it to the bishop to relay it to Mr. Rusesabagina, and it said Gainjet Airlines, destination Rwanda, or excuse me, Burundi, that would be a forum contact. That would be the transmittal of a fraudulent document into the forum. But we don't have that here. Gainjet admits that it did not issue a passenger ticket, which is unsurprising, given the facts. So we don't have that physical document. But we have the inference. So if there's no physical document here, how did the information get into the forum? It's a reasonable inference that it was therefore verbal. And just to really hone in on what we are saying here, a likely scenario would be that Rwanda, before they had the bishop send this lie to Mr. Rusesabagina, went to Gainjet and said, we are going to send this information, this lie, into this state to lure this man out. But we need your agreement. We need your agreement. It's your aircraft. And so we need you to do two things. We need you to be willing to fly him against his will to Rwanda, and we need you to be willing to lie to him on the tarmac in Dubai if he asks where the flight is headed. Because obviously, obviously, if they told him the truth, he would not get on the aircraft. Gainjet agreed, and then armed with that agreement, Rwanda said, okay, bishop, go ahead. Send that lie into the forum. That is Gainjet's lie. It's not only Gainjet's lie, but it's also Gainjet's lie that was sent into the forum. That is the forum contact. And to borrow an analogy from this court in Viennaire, Alaska, it's like if Gainjet had lit the fuse of a bomb and then handed it to someone else, and they went and detonated it in the forum. That's not imputation of someone else's conduct to Gainjet. They lit the fuse. That's basic accountability. That's Supreme Court precedent. That's Calder itself. A lie sent through a middleman into the forum is still your lie. So, where does that leave us? It leaves us with Gainjet simply denying the facts here. They say it wasn't us who directly contacted Mr. Rusesabagina in the forum. It was the bishop. That's the same exact argument that was rejected by the Supreme Court in Calder. That's the argument that the defendants made there. The writer and editor of the defamatory article, they said, we can't be subject to jurisdiction in California. We didn't go into California. We sat at our desks in Florida and wrote an article. We handed it off to someone else. They published it in California, and the court rejected that. So, it's clear that a contact with a forum can be made through a middleman, and that's what we have here. The test is aiming, intentional aiming at the forum, and harm felt in the forum. Here, Gainjet's actions outside of the forum and the facts on record show that they intentionally aimed their conduct at Mr. Rusesabagina. He was in Texas. That is aiming at the forum. Now, that's further supported by looking at the alternative here. If Gainjet had not been in on this plot from the beginning, you would essentially be adopting a theory of what happened in which a sophisticated foreign intelligence service coordinates an international kidnapping, years in the making, without first going to the most critical player, the player who is going to be doing the actual work in the kidnapping, the lying, the transporting, that they did all this, they set all this up without getting the approval of Gainjet. I posit that Rwanda did not organize this kidnapping without first securing Gainjet's authorization, because without Gainjet's sign-on at the outset, the entire plan would have collapsed. For example, if a Gainjet employee had simply said where the flight was actually headed, or had mentioned the weather in Rwanda. And that's not speculation that the plan would have collapsed. We know it would have, because Mr. Rusesabagina did, in fact, ask where the flight was headed before he boarded the aircraft. He was suspicious. If they had said, we're going to Rwanda, he would have turned around, went back home to Texas. And the Rwandan regime would have lost their once in two decades opportunity at their kidnapping. He would have remained safe in the protections of the state of Texas. Now, let me turn to the Calder effects test. The district court here was focused on where the plane took off and the dramatic harm that ensued in Rwanda. But at this stage, this case is not about takeoff. It's about where the lie landed, and it landed in Texas. So, I just want to plant a flag that this, this relaying of information, or contacting the forum through an intermediary, this is precedent. This is Guidry itself, Guidry's adoption of Calder. The facts in Guidry are that a four tobacco trade associations published misleading articles about the dangers of cigarette smoking and TV ads. And Charles Guidry, a man in Louisiana, saw these in Louisiana and proceeded to smoke. And the court held jurisdiction over these out of state trade associations. They didn't directly contact Charles Guidry in Louisiana. Again, we see a third party intermediary, excuse me. But in those cases, they are citizens of that particular state. And here he's not a citizen of Texas. Right. He's a lawful permanent resident of the United States and a resident of Texas. He has lived in Texas for almost 20 years now. Right. But I mean, that's a contrast with some of these other, with these other cases where they are citizens of the place where they're suing. I don't know, Your Honor. I don't know if Charles of Louisiana, I'm not sure that's apparent from the record, but he might have been. So in Guidry, again, we see that the contact can be made through an intermediary. And in fact, in that case, the intentional aiming itself was much less pronounced than it is here. The trade associations did not know who Mr. Guidry was. They certainly didn't know he lived in Louisiana. But they essentially assumed the risk by publishing these articles that they would be sued in Louisiana. Your Honor, as I see my time is almost up, if there are no further questions, I'd like to close with this. The Calder and conspiracy frameworks matter now more than ever, not just for this case, but for the rule of law. Denying jurisdiction here gives foreign bad actors a dangerous roadmap. It essentially tells them to use a middleman. Don't send the text or email yourself. Don't send a passenger ticket. And you can abduct a U.S. resident without consequence. That cannot be the law. The limiting principle here is already in place. It's Calder and Walden. Intentional conduct aimed at the forum. Harm felt in the forum. That's specific jurisdiction. No expansion, no overreach, just settled law applied to extraordinary and brutal facts here. We ask that you reverse and to hold that the Western District of Texas has personal jurisdiction over Gainsett. Thank you. All right. Thank you, Kelsey. You've reserved your rebuttal time. All right. We'll hear from Gainsett. Good morning, your honors. My name's Andrew Herrick as I represent the appellee Gainsett. I've stripped of all the publicity here and the allegations of conspiracy. This case involves, it's a straightforward case of jurisdiction. Was there personal jurisdiction over Gainsett? My clients categorically deny they were aware of or participated in any conspiracy or were aware what was going to happen here. Plaintiff says that the appellant says that they had to get Gainsett's involvement. Otherwise, this couldn't have happened. Well, the problem is that, you know, these type of rendition flights often occur without the carrier knowing what happened. And in this case, we simply did not know. If the Rwandan government went to a charter operator and said, look, we want to do this rendition flight, any reputable charter operators would say absolutely not. And Gainsett is a very reputable charter operator. They fly heads of states, including former president of the United States. Yeah, but they didn't say where they were going. And airplanes always do say where they're going. And that's a fairly specific thing because if he had known where they were going, he would not have gone. Your Honor, that's a great question because this is one of the issues here. This is a charter operation. It's not like commercial air carrier operations. It's not a regularly scheduled flight. This is kind of bespoke operations. You pay as you go. So even if they don't have to say where they're going, they have to know not to say to him. If he said, oh, I'm so looking forward to going, and they go, well, no, we're going to Rwanda. Well, what do you mean? That would have changed everything. So they have to know not to say it or else he probably would not have gone. So, I mean, the notion that they had no idea that they were part of this horrible situation is a little hard, at least particularly at this level that we're at. We're not after a jury trial or something. It's a little hard to say, yeah, oh, they would not have known. Your Honor, I cannot disagree with you that when you look into that context, there could be some suspicion here. But we did have the trial testimony of Mr. Ngamere, the bishop. I can't pronounce his name properly. And he basically said that he was concerned that somebody would let out, let know that this flight was going to Rwanda. That's why he diverted any time any discussions of Rwanda came up. He changed the conversation. He ensured that Mr. Resabegina was seated with his back to the flight screen. This aircraft does have a map, you know, as commercial carriers do. And you can't change that map. The map was showing it was going to Rwanda. But he turned his back to it. But again, like Your Honor said, that goes into the facts down the road. And the issues here is, is there personal jurisdiction over them? And, you know, plaintiff's two main theories is the Calder effect test and the conspiracy jurisdiction. I want one mention, I want to say one mention about Calder, that in this, well, first of all, it's clear that a plaintiff, the appellants made clear that Ganja did not contact Mr. Resabegina directly in Texas. Their allegations are it was through the bishop. And that's, I wanted to clarify that because in their briefs and in the below and here, they seem to go back and forth on that. But I think we're settled on that. And within the Calder case too, there was no middleman. The two plaintiffs, one was a reporter who was an employee of the National Enquirer. The other was the CEO, the president and editor of the National Enquirer. But the focus in those cases is the, in that case, they said you purposely aimed this article to the state of California. It doesn't, you don't have to specifically aim it to an individual. You have to show the tort going to the general public. And in Calder, the issue was libel. And you had the publication to a third party. And that's why the courts found that it was aimed to the state in general. The fact that I think that Walden clarified this, the fact that it's might, the harm may be, may be suffered by a particular individual is not necessarily the standard. You have to show the harms is suffered, is the, the conduct is aimed directly at the state and the harm is suffered causing an injury within that state. What is the, you know, one of the problems is, you know, as Judge Haynes is saying, you know, we're getting this case very, very early. I mean, just to give you an analogy, we'll get something on a motions panel, somebody's motion to dismiss, and then we get all this response and this back and forth, and it's sort of too complex to dig it all out at this. So, we'll carry that motion with the case. So, the mayor's panel or somebody else can, you know, sift through it, whatever, whatever. At some point, they may end up dismissing it. But at that early stage, there's a lot going on to figure out, you know, who's on first, who's on second, who's on third. You say, I'm going to have the gains yet. They didn't know you dispute vigorously the factual scenario that he's let out and all that. And that did not seem practical. So, I guess, you know, my threshold point, even you are engaging deeply on these facts, depending on which way they're nuanced, this thing turns. And it seems there's such a critical disposition of the case, it just seems dicey to this early in the proceedings, you know, for matters not to be developed further. If it turns out, I understand you might say, well, McClellan doesn't want to be in the lawsuit any longer than that. But, I mean, they're a big boy. You know, they're, you know, they're used to litigation. That's the nature of the deal. You stay in till you get out. That's different than getting out after you end up at trial. So, I guess, what I'm looped into here is just, you just keep making strong arguments, but they all the more seem to me, this is an entangled deal. It's been made a movie of being made of this. If it hadn't been, I'd say, well, this sounds like a movie. But there has never been a movie made out of it. And yet, we're at this threshold. So, I mean, just make the strongest case you can for why, at this earlier stage, you know, Gainjett is, I know jurisdiction is jurisdiction, but you've been honing in on facts. Your Honor, and I apologize for that. And I don't think the details of those facts are that relevant. Because let's assume Gainjett did know about this, and they told, and they said to Mr. Resabegina in Dubai that we're flying you to Burundi. And that's the whole base of our argument. Even if you assume all that, there's still no jurisdiction. Because where that conduct occurred, it occurred in Dubai. It had no connection with Texas. In fact, as the district court found, there's no evidence that Gainjett even knew Mr. Resabegina was from Texas or had any connection to the United States. He appeared in Dubai with a Belgian passport, and he boarded the flight. There was no knowledge that he was from Texas or any relation to Texas. Is this his first flight with Gainjett? Yeah, his first flight with Gainjett, Your Honor. So, when you look to the Calder effects test, you know, how can you expressly aim conduct to Texas when you don't even know Texas is involved, and you don't even know the person is from Texas. And that's one of the problems, that's one of the main problems in this case. And also with respect to the injury, the focal point in the brunt has to be suffered in Texas. But again, you have to, you want that harm to happen in Texas. It didn't happen. We didn't know he was from Texas or anywhere else. We just knew he was a citizen of Belgium. And that's it. And that's why I'm saying even, that's why I agree with Your Honor. You can get into the facts here, but that's not for this day. And the issue here also, you know, jumping to just a conspiracy jurisdiction, no court in the Fifth Circuit has ever expressly upheld jurisdiction based on conspiracy jurisdiction. In fact, I think the conspiracy jurisdiction would be contrary to the United States decision in Walden. Plaintiffs bring up the Guidry case. It's interesting because the Guidry was, of course, was decided five years before Walden, but basically came to, makes the exact same statements the Supreme Court said in Walden. It came to the conclusion of a prophetic decision. It basically said that a tort committed in the state requires each defendant individually as not part of conspiracy. Just has minimum context here. And that's where the flaw is with, and that's what the Walden case said. So a conspiracy jurisdiction would ignore the context of Game Jet and focus on the context of the co-conspirators, which I don't see how you can reconcile with Walden or even the Guidry case. And I, you know, and even if it's viable, plaintiffs would have to show that there's jurisdiction over one of the co-conspirators in Texas. And here, you know, there was no other defendant and every single conspiracy case in the circuit court decisions, usually the co-conspirator is part of that litigation. And here that co-conspirator would not be part of the litigate, the alleged co-conspirator. So bending, you know, plaintiffs essentially want to bend the rules on personal jurisdiction and sue a private jet operator that has no connection with Texas. And that doesn't uphold the rule of law. It subverts personal jurisdiction. The district court in a well-reasoned decision. But if the conspirators know the effect of this is taking him away from Texas, I mean, in other words, now they're going to throw him into Rwanda and he ain't going back to Texas. Luckily he finally did. But that even if they themselves don't care about Texas, I mean, they're taking him away from whoever's with him in Texas and so forth. Isn't that what they know, at least the co-conspirators? The co-conspirators may, but then you would have to, what I'm saying is that that's, but that doesn't establish minimum context of Ganget. The record, I don't think anybody disputes, Ganget had zero contacts with the state of Texas. They didn't even know Texas was involved. So what you're doing, what conspiracy jurisdiction does is you're saying, well, you have jurisdiction over one co-conspirator and you're sweeping in everybody else. But I think that's contrary to the constitution and I think it's clearly, might be contrary to Walden and Guidry. What's your best case that says that? Assuming one of the conspirators knows they're taking him out of Texas, knows they're impacting Texas, la la la, but you're saying another one doesn't, but is a co-conspirator. What is your best case that says, nah, that's not personal jurisdiction? I would rely on, other than the Delta Brands case, which relied on Guidry and the Walden case, the Supreme Court decision of Walden, Your Honor, which basically that you have to assess each individual defendant's context with the jurisdiction to assess personal jurisdiction. I think we've had three or four decisions from the district court analyzing various aspects of this and finally concluding that there isn't personal jurisdiction. I think all those decisions were reasoned and thoroughly considered. The court recognized many of the facts, Your Honors, yourself noted today about the issue of the tickets not being issued. Well, again, that goes back to charter operations. Charter operators do not issue tickets. There's a charter operation, a charter contract, and it says, we're going to charter this flight from A to B. When the passengers get on board, they don't issue them tickets. It's just not how it's done. They don't give announcements, generally give announcements to the passengers. They're paying for a private service and they don't necessarily want to be bothered with this information. Also, another fact that the court below focused on is the plane remaining on the ground for nine days. Again, not unusual in the charter context. As long as someone's willing to pay, the charter operator is happy to keep the aircraft there. Bottom line, Your Honors, is that Jane Judd is a reputable charter operator and it makes no sense that they would sacrifice their entire business operations for $120,000 charter flight. It just doesn't make sense. But that's on the side. I know I sort of go off into those areas. Again, you have to look at- I thought Jane Judd was working with Rwanda on other stuff. They do have an annual charter. They had an annual charter agreement with the government of Rwanda and it would fly. Because a lot of these countries, it's not like the United States. You have Air Force One and the government operates it. They can't afford those things. So a lot of these countries, they hire private charter operators to conduct state flights business for them because they can't afford to maintain an aircraft just for government purposes in that regard. In a case like this, the charter contract for the voyage, would the plaintiff not have signed that contract? Mr. Isabeguena, no. Because you have people that organize the charters and then the passengers just show up. Like here, they present identification and they need identification to do extra exit controls in the UAE to go on and that's it. The charter contract said the destination was from point A to Rwanda. He would never have signed the contract and have seen- No, Your Honor. No, not at all, Your Honor. In fact, when you fly charter on private charter flights, you call up the charter operator. You see advertisements in my hotel room by someone. You call them up. I want to go from A to B. They say, okay, fine. Pay us the crazy amount of money and show up and you get on. You don't get a ticket or anything like that. So the bottom line here is I think the district court analyzed these issues both under the Calder effects test, which did not apply when you look at the Calder effects test, as well as an initial conspiracy jurisdiction. Is this not a viable theory? And there are a number of decisions. You have the Delta brands, chow, in the Fifth Circuit that have not recognized conspiracy jurisdiction, as well as the Texas Supreme Court rejected that years ago. So, Your Honor, do you have any other questions? No. He does not. It's an interesting case, to put it mildly. Thank you, Your Honors. Thank you very much. All right. Back to you, Counsel, for your rebuttal. Counsel pounds very hard. There's just no connection with Texas, no matter how, you know, excruciating the facts are, et cetera, et cetera, et cetera. Your Honor, I would point again to Calder. So, defendant here is simply stating that you can't impute the bishop's conduct to Gainjet, but the facts on record show that it is Gainjet speaking through the bishop into Texas, just as if it was a passenger ticket. The bishop is the ticket, if you will. This is how they relayed the false flight information into Texas. And I want to just push back here against counsel's repeated insistence that this flight was normal. We know it was not. It is a matter of record that Gainjet lied to Mr. Recessa Pagina on the tarmac twice. Both the pilot and the stewardess told him the flight was going to Burundi. That is a matter of record. And then we see what happens when the flight, when the plane lands in Rwanda. It is a matter of record that Gainjet allows Rwandan agents to board the aircraft. And it's a matter of record that Gainjet stands by and does nothing as those agents hogtie and gag Mr. Recessa Pagina as he screams for help. That's a matter of record. Now, it's also a matter of record that Gainjet has described this as a normal flight. They said no investigation was necessary. I think that tells you all you need to know. This was not a normal flight. Now, we're not asking this court to rewrite the law. We're asking it to apply Calder and Walden. Walden, frankly, does not apply here. It clarifies a point in Calder that's not relevant here. Walden says you can't establish jurisdiction simply by the plaintiff's residence alone. That's not what we are doing here. We are showing that Gainjet reached into the forum. We're not holding Gainjet accountable for someone else's conduct. We're holding it accountable for its own. And this court has never held that a tortfeasor can reach into a forum, commit a tort there, and then dodge jurisdiction by simply denying the facts or that the contact was his. This is a 12-B-2. This court has never held that. And it shouldn't start today. Thank you. All right. Thank you, counsel, both sides. We're briefing in the oral argument in the case. Case will be submitted. All right. We'll call up our second case, 24-20405, Fire Protection Service v. Cervitec. Thank you.